**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Yu Shi, Esq. (*Pro Hac Vice*)
275 Madison Ave, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK SPANIER and MARISSA WEERESINGHE, Individually and on behalf of all others similarly situated, | Case No: 2:20-cv-15081-CCC-AME |
|      Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
|      v. | **JURY TRIAL DEMANDED** |
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, BMW OF NORTH AMERICA, LLC, OLIVER ZIPSE, HARALD KRÜGER, NORBERT REITHOFER, KARL-LUDWIG KLEY, BERNHARD KUHNT, NICOLAS PETER, and LUDWIG WILLISCH | |
|      Defendants. | |

1

Lead Plaintiff Mark Spanier and named plaintiff Marissa Weeresinghe ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Defendants, interviews with former employees of BMW of North America, LLC, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased the publicly-traded American Depositary Receipts ("ADRs") of Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") from November 3, 2015 through September 24, 2020, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities

laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      BMW AG is an automotive company that manufactures and sells premium vehicles worldwide primarily under the BMW brand.[1]

3.      The United States is one of BMW AG's most important and lucrative markets, accounting for approximately 15% of BMW AG's vehicle sales volume since 2015.

4.      During the Class Period, unbeknownst to investors, BMW AG and its wholly-owned U.S. subsidiary, BMW of North America, LLC ("BMW NA," and together with BMW AG, "BMW"), employed several tactics to manipulate BMW's reported U.S. retail sales volume figures. BMW engaged in these tactics so that it could: (a) publicly maintain a leading position relative to other premium automotive companies, and (b) close the gap between actual retail sales volume and internal retail sales targets.

5.      The market learned of BMW's sales manipulations on September 24, 2020 when the SEC, after a year-long investigation, published its findings and announced a settlement with BMW.

---

[1] BMW AG also owns the MINI and Rolls-Royce brands, which account for less than 20% of BMW AG's total vehicle sales.

6.    The SEC found that BMW used three tactics to artificially inflate its publicly-reported U.S. retail sales volume: (1) bribing BMW dealerships to designate vehicles as demonstrators and service loaners, which BMW then counted as retail vehicle sales; (2) maintaining an excessive reserve of unreported vehicle sales to meet sales targets in future months, and (3) manipulating the standardized retail sales reporting calendar to achieve sales targets or to bank excess sales for future use.

7.    As a result of these deceptive tactics, the retail sales figures that BMW reported to the public during the Class Period were false and misleading.

8.    Not only did BMW dealerships voice their concerns to BMW management about the impropriety of these tactics,[2] BMW's Internal Audit group also detected these manipulative tactics in 2015. Starting in 2015 and for the next several years, BMW's Internal Audit group, which reported directly to the Audit Committee chaired by Defendant Kley, repeatedly warned BMW management about these unscrupulous practices and urged BMW management to stop doing them.    BMW management ignored the Internal Audit group's warnings and continued the sales manipulations until the SEC opened its investigation.

---

[2] For example, BMW dealers described the demonstrators and service loaner program as "late-inning monthly close shenanigans," "panic punch programs," and "false reporting."

9.     For BMW investors, the damage was already done. After the SEC publicized its findings from its investigation into BMW, the price of BMW AG's ADRs dropped immediately in response, damaging Plaintiffs and similarly situated BMW investors.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district, and BMW conducts substantial business in this district.

13.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Lead Plaintiff Mark Spanier ("Spanier") purchased BMW AG's ADRs during the Class Period and was economically damaged thereby. Spanier's PSLRA certification was previously filed with the Court and is incorporated by reference herein. *See* Dkt. No. 11-5.

15.     Named plaintiff Marissa Weeresinghe ("Weeresinghe") purchased BMW AG's ADRs during the Class Period and was economically damaged thereby. Weeresinghe's PSLRA certification is attached hereto as Exhibit 1.

16.     Defendant BMW AG, together with its subsidiaries, develops, manufactures, and sells automobiles and motorcycles worldwide. BMW AG and its subsidiaries form the BMW Group, which BWG AG manages and controls. BMW AG is incorporated in Germany and its headquarters are located in Munich, Germany. BMW AG's ADRs trade over-the-counter in the U.S. on the OTC under the ticker symbols "BMWYY" and "BAMXF."

17.     Defendant BMW NA is BMW's wholly-owned U.S. subsidiary. BMW NA is the national sales company of BMW in the U.S. and imports and distributes BMW vehicles to independently-owned BMW dealerships in the United States. BMW NA's headquarters are located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey, 07675.

18.    Defendants BMW AG and BMW NA are referred to collectively herein as "BMW."

19.    Defendant Oliver Zipse ("Zipse") has served as Chairman of BMW AG's Board of Management[3] and BMW AG's Chief Executive Officer ("CEO") since August 16, 2019.

20.    Defendant Harald Krüger ("Krüger") was BMW AG's CEO from May 13, 2015 until August 16, 2019.

21.    Defendant Norbert Reithofer ("Reithofer") served as BMW AG's Chairman of the Supervisory Board[4] and was member of BMW AG's Audit Committee during the Class Period.

---

[3] According to BMW's Annual Reports issued during the Class Period, the Board of Management is responsible for, among other things, "managing the enterprise" and "ensuring that all provisions of law and internal regulations are complied with." The Board of Management is also responsible for "ensuring that appropriate risk management and risk controlling systems are in place throughout the [BMW Group]." The Board of Management "informs the Supervisory Board and reports to it regularly, promptly and comprehensively [.]"

[4] According to BMW's Annual Reports issued during the Class Period, the Supervisory Board is responsible for, among other things: "advising and supervising the Board of Management in its Management of BMW AG. It is involved in all decisions of fundamental importance for BMW AG."

22.    Defendant Nicholas Peter ("Peter") has served as BMW AG's Chief Financial Officer ("CFO") and has been a member of BMW AG's Board of Management since January 1, 2017.

23.    Defendant Karl-Ludwig Kley ("Kley") served as Deputy Chairman of BMW AG's Supervisory Board and was Chairman of BMW AG's Audit Committee during the Class Period.

24.    Defendant Bernhard Kuhnt ("Kuhnt") has served as BMW NA's CEO since March 1, 2017.

25.    Defendant Ludwig Willisch ("Willisch") was BMW NA's CEO from 2012 to February 28, 2017.

26.    Defendants Zipse, Krüger, Reithofer, Peter, Kley, Kuhnt, and Willisch are collectively referred to herein as the "Individual Defendants."

27.    Each of the Individual Defendants:

(a)    directly participated in the management of BMW;

(b)    was directly involved in the day-to-day operations of BMW at the highest levels;

(c)    was privy to confidential proprietary information concerning BMW and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of BMW's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the BMW; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

28.     BMW is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

29.     The scienter of the Individual Defendants and other employees and agents of BMW is similarly imputed to BMW under *respondeat superior* and agency principles.

30.     Defendants BMW AG, BMW NA, and the Individual Defendants are collectively referred to herein as "Defendants."

## DETAILED ALLEGATIONS OF DEFENDANTS' FRAUD

31.    BMW is one of the world's largest automobile manufacturers, making and selling vehicles primarily under the BMW brand. Since 2015, BMW brand vehicles have accounted for over 80% of BMW's total vehicle sales.

32.    While BMW vehicles are sold worldwide, the U.S. is one of BMW's most important markets. Since 2015, the U.S. has been BMW's second-largest national market, accounting for approximately 15% of total vehicles sold by BMW.

33.    Unbeknownst to investors, and in an effort to: (a) publicly maintain a leading position relative to other premium automotive companies, and (b) close the gap between actual retail sales volume and internal retail sales targets for BMW NA, BMW during the Class Period employed deceptive tactics that had the effect of inaccurately and misleadingly inflating its publicly-reported retail sales volume.

34.    A partial disclosure of BMW's fraud came on December 23, 2019, when *The Wall Street Journal* reported that the SEC had opened an investigation into whether BMW AG was manipulating sales figures (the "WSJ Article"). The WSJ Article, however, did not reveal any specifics of the investigation, such as how or when the alleged manipulations occurred, or to what extent the retail sales figures were inflated.

35.    Nevertheless, the adverse news in the WSJ Article caused an immediate drop in the value of BMW AG's ADRs, damaging investors.  BMWYY fell by $0.36

per ADR, or 1.3%, on December 23, 2019. The same day, BAMXF fell by $1.55 per ADR, or 1.9%.

36.     Investors finally learned the truth on September 24, 2020, when the SEC issued its Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order against BMW (the "SEC Order").

37.     In the SEC Order, the SEC spelled out in detail its findings from the investigation into BMW's manipulation of sales numbers. The SEC found that beginning in 2015, BMW used three tactics to artificially inflate its retail vehicle sales volume in the United States: (1) bribing BMW dealerships to designate vehicles as demonstrators and loaners, which BMW then counted as retail vehicle sales; (2) maintaining an excessive reserve of unreported vehicle sales to meet sales targets in future months, and (3) manipulating the standardized retail sales reporting calendar to achieve sales targets or to bank excess sales for future use.

38.     The release of the SEC Order caused another immediate drop in the price of BMW AG's ADRs, damaging investors. BMWYY fell $0.51 per ADR, or approximately 2.2%, to close at $23.07 on September 25, 2020. The same day, BAMXF fell $2.54 per ADR, or about 3.5%, to close at $6891.

*Sales Manipulation Tactic #1: The Demonstrator and Loaner Program*

39.     The SEC found that from January 2015 to March 2017, BMW NA

bribed independently-owned BMW dealers to designate vehicles as demonstrators (*i.e.,* vehicles used for test drives, showroom displays, or other marketing purposes) or service loaners so that BMW could count those vehicles as retail sales, even though the dealers had not sold the vehicles to customers. This was done without regard to whether dealers had a legitimate business need for additional demonstrators and service loaners, or whether the dealers put those vehicles to use as demonstrators or service loaners.

40.    This practice was known at BMW as "month-end actions," as it allowed BMW NA to "close the gap" between its expected retail sales and its retail sales targets on a monthly basis.

41.    According to the SEC's findings, BMW AG management was aware of, and authorized, BMW NA's use of the month-end actions. Indeed, BMW NA management told BMW AG management that sales targets were difficult to achieve and could only be met if retail sales included a significant number of demonstrator and loaner vehicles.

42.    BMW paid dealers between $1,000 and $3,000 for each vehicle designated as a demonstrator or service loaner as part of the month-end actions.

43.    According to the SEC, month-end action demonstrators and loaners accounted for 27% of BMW NA's reported retail sales volume for the period from January 2015 through March 2017. The SEC found that the month-end actions were

employed in "most months" during the period from January 2015 to March 2017, with demonstrators and loaners reaching as high as 40% of BMW NA's reported retail sales during certain months.

44.    The SEC found that, for example, in November 2015, BMW NA management issued instructions to "find ways to get above 32,000 retails." The sales department proposed using the demonstrator and loaner program to achieve that target. BMW NA reported 32,003 retail sales for that month, more than one-third of which consisted of demonstrators, loaners, and banked vehicles.

45.    The SEC found that these month-end actions involving demonstrators and loaners also impacted year-over-year retail sales volume comparisons. For example, at the end of December 2015, BMW NA executives noted that, without the demonstrator program, "we would end up" with "no growth in 2015" retail sales when compared to BMW NA's 2014 retail sales.

46.    BMW was motivated to inflate retail sales volume through the demonstrator and loaner program in part to publicly maintain a leading position relative to other premium automotive companies. The SEC found that, for example, in evaluating whether and how much to use month-end action to achieve sales targets for December 2015, BMW NA management reviewed the sales figures of competitors, because "[t]hey would hate to miss any chance of still staying ahead by a few hundred or thousand units." BMW NA had forecasted that it would end 2015

with approximately 345,000 retail sales, but after reviewing sales data for other premium brands, BMW decided to aim for approximately 346,000 retail sales, and issued instructions for its sales team to "try to get as much in terms of loaners as possible." BMW NA ultimately reported 346,023 retail sales for 2015, with demonstrators and loaners accounting for 44% of BMW NA's reported retail sales in December 2015, and 30% of its reported retail sales overall in 2015.

47.    The SEC Order described some dealers as being perturbed by the month-end actions involving demonstrators and loaners, telling BMW that these programs were "late-inning monthly close shenanigans" and "panic punch programs," as well as expressing concerns to BMW about "false reporting."

48.    BMW ended the month-end actions in April 2017, in part due to growing complaints from dealers, and out of concern over rising dealer inventories.

***Sales Manipulation Tactic #2: "Banking" Unreported Sales for Future Use***

49.    According to the SEC, in "most months" from 2015 through 2019, BMW NA used an excess reserve of previously unreported retail sales to manipulate its reported retail sales volume. In months that total retail sales reported by dealers exceeded BMW NA's internal targets, BMW NA selected what retail sales number to report publicly and "banked" (*i.e.* held back/kept in reserve) the remaining retail sales. In months that total retail sales reported by dealers fell short of BMW NA's targets, BMW NA used retail sales from that bank to help close the gap.

50.     For example, in September 2016, BMW NA management discussed that the forecasted number of retail sales for that month "includes bank withdrawals of 2,325." BMW NA publicly reported 25,389 retail sales for September 2016, which included those 2,325 banked retail sales.

51.     The SEC found that from 2015 through 2019, adjustments made using the bank often exceeded 10% of the total retail sales reported by dealers in a month.

52.     The management of BMW AG and BMW NA were both aware of, and approved, the use of the bank. According to the SEC, BMW NA management discussed the use of the bank with BMW AG management. In one instance, BMW AG management told BMW NA management that it could bank retail sales from the prior year because BMW AG had already achieved its internal sales targets without those additional retail sales.

53.     BMW's tactic of banking excessive sales for future use is exactly the kind of "cookie jar reserves" that the SEC has long recognized as misleading. Former SEC Chairman Arthur Levitt described "cookie jars" as one of the main "gimmicks" used by public companies to manipulate their books: "they stash accruals in cookie jars during the good times and reach into them when needed in the bad times."

***Sales Manipulation Tactic #3: Modifying Retail Sales Reporting Calendar***

54.     According to the SEC, in January 2015 and January 2017, BMW NA improperly adjusted its retail sales reporting calendar, which usually followed a

standard calendar used in the automotive industry, to achieve internal retail sales targets or bank excess retail sales for use in future reporting periods.

55.    For example, in January 2017, BMW NA closed the December 2016 retail sales reporting period early, out of fear that BMW's Internal Audit group would pressure it to stop the use of the bank in 2017. By closing the December 2016 retail sales period early once 2016 targets were achieved, BMW NA essentially created a bank of unreported retail sales for use in 2017.

## ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

56.    The SEC found that BMW's Internal Audit group detected two of the sales manipulation tactics, and urged BMW AG and BMW NA to stop those practices, but management at both BMW AG and BMW NA refused to do so.

57.    The SEC found that in starting in March 2015, BMW's Internal Audit group detected and objected to the use of the bank to meet sales targets, warning BMW management these "[r]etail sales reporting inaccuracies lead to an inappropriate assessment of sales performance and may result in unsustainable marketing and sales business practices." According to the SEC, starting in March 2015 Internal Audit "repeatedly warned" BMW's management about the use of the bank "over the next few years," but BMW did not discontinue the practice until 2020 when the SEC started probing it.

58.    Similarly, BMW's Internal Audit group determined in May 2015 that

BMW NA was using demonstrators and loaners to inflate retail vehicle sales. The Internal Audit group recommended limiting what percentage of overall sales could consist of demonstrators and loaners, and carefully monitoring the use of these categories. However, BMW AG and BMW NA management ignored these recommendations, and six months later, in November 2015, the Internal Audit group determined that the use of demonstrators had actually increased.

59. According to BMW AG's Annual Reports published during the Class Period, the Internal Audit group reports its findings directly to BMW AG's Audit Committee. Defendant Kley was Chair of the Audit Committee during the Class Period, and Defendant Reithofer was also a member of the Audit Committee during the Class Period.

60. Additionally, according to the SEC Order, BMW admitted to the SEC that BMW NA used the bank and modified the standard retail sales reporting calendar. Following the commencement of the SEC's investigation, BMW agreed to discontinue using the bank and to enhance its disclosures about the inclusion of demonstrators and loaners in its publicly-reported retail sales figures. The SEC Order stated that, in consideration of BMW's extensive cooperation, the SEC determined that a reduced penalty of $18 million was appropriate.

61. The findings in the SEC Order were the result of a thorough investigation by the SEC. According to the SEC, BMW produced voluminous

documents to the SEC during the course of the investigation, and made multiple current and former employees available for interviews by the SEC.  Indeed, the SEC informed Plaintiffs that this investigation produced the equivalent of approximately 4 million pages of documents.

62.    The SEC Order stated that BMW agreed that it would not contest the SEC's findings in any future administrative proceedings. BMW would not have relinquished its right to contest the SEC's findings if BMW felt that they were inaccurate.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

63.    Because BMW was manipulating its U.S. retail sales numbers, BMW's disclosures about vehicles sold in the U.S. during the Class Period were false and misleading.

64.    BMW's statements about its internal controls during the Class Period were also false and misleading for failure to disclose that BMW's management did not take heed of the Internal Audit group's warnings about the manipulative sales reporting tactics, and refused to implement the Internal Audit group's recommendation to cease those actions.

65.    BMW's inaccurate disclosures included the following:

66.    On November 3, 2015, BMW issued a press release reporting 29,439 vehicles sold in the U.S. in October 2015.  Defendant Willisch was quoted in this

press release.

67.    On November 3, 2015, BMW also released its quarterly results for the quarter ended September 30, 2015 (the "3Q15 Results"). BMW stated that in 3Q15, BMW sold 96,310 vehicles in the U.S., representing an increase of 1.9% from the same quarter in 2014, and that BMW sold 295,728 vehicles in the U.S. in the nine months of 2015 ended September 30, 2015, representing an increase of 7.0% from the same period in 2014.[5]

68.    On December 1, 2015, BMW issued a press release reporting 32,003 vehicles sold in the U.S. in November 2015.  Defendant Willisch was quoted in this press release.

69.    On January 5, 2016, BMW issued a press release reporting 34,625 vehicles sold in the U.S. in December 2015, and 346,023 total vehicles sold in the U.S. for year 2015.  Defendant Willisch was quoted in this press release.

70.    On February 2, 2016, BMW issued a press release reporting 18,082 vehicles sold in the U.S. in January 2016. Defendant Willisch was quoted in this press release.

71.    On March 1, 2016, BMW issued a press release reporting 22,498 vehicles sold in the U.S. in February 2016. Defendant Willisch was quoted in this

_____

[5] These totals include U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

press release.

72.     On March 16, 2016, BMW issued a press release containing a weblink to its financial results and annual report for the fiscal year ended December 31, 2015 (the "2015 Annual Report"). The 2015 Annual Report stated that BMW sold 405,715 vehicles in the U.S. in 2015.[6] The 2015 Annual Report also included a lengthy discussion on corporate governance and internal controls, but omitted to disclose that BMW was engaged in tactics to manipulate retail sales numbers, and that BMW management was ignoring the Internal Audit group's warnings to stop the manipulation.

73.     On April 1, 2016, BMW issued a press release reporting 30,033 vehicles sold in the U.S. in March 2016. Defendant Willisch was quoted in this press release.

74.     On May 3, 2016, BMW issued a press release reporting 24,951 vehicles sold in the U.S. in April 2016. Defendant Willisch was quoted in this press release.

75.     On May 3, 2016, BMW also released its quarterly results for the quarter ended March 31, 2016 (the "1Q16 Results"). The 1Q16 Results stated that in 1Q16, BMW sold 81,601 vehicles in the U.S.[7]

---

[6] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.
[7] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

76.     On June 1, 2016, BMW issued a press release reporting 29,017 vehicles sold in the U.S. in May 2016. Defendant Willisch was quoted in this press release.

77.     On July 1, 2016, BMW issued a press release reporting 28,855 vehicles sold in the U.S. in June 2016. Defendant Willisch was quoted in this press release.

78.     On August 2, 2016, BMW issued a press release reporting 25,777 vehicles sold in the U.S. in July 2016. Defendant Willisch was quoted in this press release.

79.     On September 1, 2016, BMW issued a press release reporting 25,531 vehicles sold in the U.S. in August 2016. Defendant Willisch was quoted in this press release.

80.     On October 3, 2016, BMW issued a press release reporting 25,389 vehicles sold in the U.S. in September 2016. Defendant Willisch was quoted in this press release.

81.     On November 1, 2016, BMW issued a press release reporting 24,017 vehicles sold in the U.S. in October 2016. Defendant Willisch was quoted in this press release.

82.     On December 1, 2016, BMW issued a press release reporting 26,189 vehicles sold in the U.S. in November 2016. Defendant Willisch was quoted in this press release.

83.     On January 4, 2017, BMW issued a press release reporting 32,835

vehicles sold in the U.S. in December 2016, and 313,174 total vehicles sold in the U.S. for year 2016. Defendant Willisch was quoted in this press release.

84.     On February 1, 2017, BMW issued a press release reporting 18,109 vehicles sold in the U.S. in January 2017. Defendant Willisch was quoted in this press release.

85.     On March 1, 2018, BMW issued a press release reporting 23,508 vehicles sold in the U.S. in February 2017. Defendant Willisch was quoted in this press release.

86.     On March 21, 2017, BMW issued a press release containing a weblink to its financial results and annual report for the fiscal year ended December 31, 2016 (the "2016 Annual Report"). The 2016 Annual Report stated that BMW sold 366,500 vehicles in the U.S. in 2016.[8] The 2016 Annual Report also included a lengthy discussion on corporate governance and internal controls, but omitted to disclose that BMW was engaged in tactics to manipulate retail sales numbers, and that BMW management was ignoring the Internal Audit group's warnings to stop the manipulation.

87.     On April 3, 2017, BMW issued a press release reporting 31,015 vehicles sold in the U.S. in March 2017. Defendant Kuhnt was quoted in this press

---

[8] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

release.

88.     On May 2, 2017, BMW issued a press release reporting 22,624 vehicles sold in the U.S. in April 2017. Defendant Kuhnt was quoted in this press release.

89.     On May 4, 2017, BMW released its quarterly results for the quarter ended March 31, 2017 (the "1Q17 Results"). BMW stated that in 1Q17, BMW sold 82,169 vehicles in the U.S., representing a 0.7% increase over the 81,601vehicles sold in the same quarter in 2016.[9]

90.     On June 1, 2017, BMW issued a press release reporting 25,818 vehicles sold in the U.S. in May 2017. Defendant Kuhnt was quoted in this press release.

91.     On July 3, 2017, BMW issued a press release reporting 28,962 vehicles sold in the U.S. in June 2017. Defendant Kuhnt was quoted in this press release.

92.     On August 1, 2017, BMW issued a press release reporting 21,965 vehicles sold in the U.S. in July 2017. Defendant Kuhnt was quoted in this press release.

93.     On August 3, 2017, BMW released its results for the quarter ended June 30, 2017 (the "2Q17 Results"). BMW stated that it sold 89,616 vehicles in the U.S. in 2Q17, compared to 97,501 vehicles sold in the same quarter in 2016.[10]

_____

[9] These totals include U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.
[10] These totals include U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

94.     On September 1, 2017, BMW issued a press release reporting 23,553 vehicles sold in the U.S. in August 2017. Defendant Kuhnt was quoted in this press release.

95.     On October 3, 2017, BMW issued a press release reporting 25,571 vehicles sold in the U.S. in September 2017. Defendant Kuhnt was quoted in this press release.

96.     On November 2, 2017, BMW issued a press release reporting 23,208 vehicles sold in the U.S. in October 2017. Defendant Kuhnt was quoted in this press release.

97.     On November 7, 2017, BMW released its results for the period ended September 30, 2017 (the "3Q17 Results"). BMW stated that it sold 83,897 vehicles in the U.S. in 3Q17, compared to 90,782 vehicles sold in the same quarter in 2016.[11]

98.     On December 1, 2017, BMW issued a press release reporting 28,049 vehicles sold in the U.S. in November 2017. Defendant Kuhnt was quoted in this press release.

99.     On January 3, 2018, BMW issued a press release reporting its December 2017 and Year-End U.S. Sales. BMW reported total U.S. sales of 34,253 for December 2017 and 305,685 for full year 2017.

---

[11] These totals include U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

100.    On February 1, 2018, BMW issued a press release reporting 19,016 vehicles sold in the U.S. in January 2018. Defendant Kuhnt was quoted in this press release.

101.    On March 1, 2018, BMW issued a press release reporting 23,508 vehicles sold in the U.S. in February 2018. Defendant Kuhnt was quoted in this press release.

102.    On March 21, 2018, BMW issued a press release containing a web link to its financial results and annual report for the fiscal year ended December 31, 2017 (collectively, the "2017 Annual Report"). The 2017 Annual Report stated that BMW sold 353,819 vehicles in the U.S. in 2017, including 98,137 vehicles sold in the U.S. in the fourth quarter of 2017.[12] The 2017 Annual Report also included a lengthy discussion on corporate governance and internal controls, but omitted to disclose that BMW was engaged in tactics to manipulate retail sales numbers, and that BMW management was ignoring the Internal Audit group's warnings to stop the manipulation.

103.    On April 3, 2018, BMW issued a press release reporting 31,311 vehicles sold in the U.S. in March 2018. Defendant Kuhnt was quoted in this press release.

---

[12] These totals include U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

25

104.    On May 1, 2018, BMW issued a press release reporting 27,213 vehicles sold in the U.S. in April 2018. Defendant Kuhnt was quoted in this press release.

105.    On May 4, 2018, BMW released its results for the period ended March 31, 2018 (the "1Q18 Results"). BMW reported that it sold 84,630 vehicles in the U.S. between January 1, 2018 and March 31, 2018.[13]

106.    On June 1, 2018, BMW issued a press release reporting 30,888 vehicles sold in the U.S. in May 2018. Defendant Kuhnt was quoted in this press release.

107.    On July 3, 2018, BMW issued a press release reporting 29,407 vehicles sold in the U.S. in July 2018. Defendant Kuhnt was quoted in this press release.

108.    On August 1, 2018, BMW issued a press release reporting 21,965 vehicles sold in the U.S. in July 2018.  Defendant Kuhnt was quoted in this press release.

109.    On August 2, 2018, BMW released its results for the quarter ended June 30, 2018 (the "2Q18 Results"). BMW reported that it sold 91,940 vehicles in the U.S. in 2Q18, representing a 2.6% increase over the same period in 2017.[14]

110.    On September 4, 2018, BMW issued a press release reporting 23,789 vehicles sold in the U.S. in August 2018. Defendant Kuhnt was quoted in this press

---

[13] These totals include U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.
[14] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

release.

111.   On October 2, 2018, BMW issued a press release reporting 25,908 vehicles sold in the U.S. in September 2018. Defendant Kuhnt was quoted in this press release.

112.   On November 1, 2018, BMW issued a press release reporting 23,262 vehicles sold in the U.S. in October 2018. Defendant Kuhnt was quoted in this press release.

113.   On November 7, 2018, BMW released its results for the quarter ended September 30, 2018 (the "3Q18 Results"). BMW reported that it sold 83,897 vehicles in the U.S. in 3Q18.[15]

114.   On December 3, 2018, BMW issued a press release reporting 28,330 vehicles sold in the U.S. in November 2018. Defendant Kuhnt was quoted in this press release.

115.   On January 3, 2019, BMW issued a press release reporting its "December 2018 and Year-End U.S. Sales." BMW reported total U.S. sales of 34,357 for December 2018 and 311,014 for full year 2017. Defendant Kuhnt was quoted in this press release.

116.   On February 1, 2019, BMW issued a press release reporting 18,102

_____

[15] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

vehicles sold in the U.S. in January 2019. Defendant Kuhnt was quoted in this press release.

117.  On March 1, 2019, BMW issued a press release reporting 23,558 vehicles sold in the U.S. in February 2019. Defendant Kuhnt was quoted in this press release.

118.  On March 20, 2019, BMW issued a press release containing a web link to its financial results and annual report for the fiscal year ended December 31, 2018 (collectively, the "2018 Annual Report"). The 2018 Annual Report stated that BMW sold 353,819 vehicles in the U.S. in 2018.[16] The 2018 Annual Report also included a lengthy discussion on corporate governance and internal controls, but omitted to disclose that BMW was engaged in tactics to manipulate retail sales numbers, and that BMW management was ignoring the Internal Audit group's warnings to stop the manipulation.

119.  On April 2, 2019, BMW issued a press release reporting 32,228 vehicles sold in the U.S. in March 2019. Defendant Kuhnt was quoted in this press release.

120.  On May 1, 2019, BMW issued a press release reporting 23,816 vehicles sold in the U.S. in April 2019. Defendant Kuhnt was quoted in this press release.

---

[16] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

121.   On May 7, 2019, BMW released its results for the quarter ended March 31, 2019 (the "1Q19 Results"). BMW reported that it sold 83,158 vehicles in the U.S. in 1Q18.[17]

122.   On June 3, 2019, BMW issued a press release reporting 27,109 vehicles sold in the U.S. in May 2019.  Defendant Kuhnt was quoted in this press release.

123.   On July 2, 2019, BMW issued a press release reporting 31,627 vehicles sold in the U.S. in June 2019. Defendant Kuhnt was quoted in this press release.

124.   On August 1, 2019, BMW issued a press release reporting 23,015 vehicles sold in the U.S. in July 2019. Defendant Kuhnt was quoted in this press release.

125.   On August 1, 2019, BMW released its results for the quarter ended June 30, 2019 (the "2Q19 Results"). BMW reported that it sold 91,621 vehicles in the U.S. in 2Q19.[18]

126.   On September 1, 2019, BMW issued a press release reporting 25,505 vehicles sold in the U.S. in August 2019. Defendant Kuhnt was quoted in this press release.

127.   On October 1, 2019, BMW issued a press release reporting 27,467

---

[17] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.
[18] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

vehicles sold in the U.S. in September 2019. Defendant Kuhnt was quoted in this press release.

128.   On November 1, 2019, BMW issued a press release reporting 25,440 vehicles sold in the U.S. in October 2019.  Defendant Kuhnt was quoted in this press release.

129.   On November 6, 2019, BMW released its results for the quarter ended September 30, 2019 (the "3Q19 Results"). BMW reported that it sold 86,499 vehicles in the U.S. in 3Q19, representing a 3.6% increase over the same period in 2017.[19]

130.   On December 3, 2019, BMW issued a press release reporting 31,213 vehicles sold in the U.S. in November 2019. Defendant Kuhnt was quoted in this press release.

131.   On January 3, 2020, BMW issued a press release reporting its "December 2019 and Year-End U.S. Sales." BMW reported total U.S. sales of 34,357 for December 2019 and 324,826 for full year 2019, representing a 4.4% increase from 2018.

132.   On March 19, 2020, BMW issued a press release containing a web link to its financial results and annual report for the fiscal year ended December 31, 2019

---

[19] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

(collectively, the "2019 Annual Report"). The 2019 Annual Report stated that BMW sold 375,751 vehicles in the U.S. in 2019, an increase of 5.7% over 2018.[20] The 2019 Annual Report also included a lengthy discussion on corporate governance and internal controls, but omitted to disclose that BMW was engaged in tactics to manipulate retail sales numbers, and that BMW management was ignoring the Internal Audit group's warnings to stop the manipulation.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

133.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired BMW AG's ADRS that were publicly traded on the OTC during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, present and former officers and directors of BMW, members of such excluded person's immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant or excluded person have or had a controlling interest. Also excluded from the Class are persons who suffered no compensable losses.

134.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BMW AG's ADRs were actively

---

[20] This total includes U.S. sales of all BMW Group brands, including MINI and Rolls-Royce.

traded on the OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

135.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

136.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

137.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business BMW;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused BMW to issue false and misleading public filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and public filings;

- whether the prices of BMW AG's ADRs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

139.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- BMW AG's ADRs met the requirements for listing, and were listed and actively traded on the OTC, a highly efficient and automated market;

- As a public issuer, BMW AG filed periodic public reports;

- BMW AG regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- BMW AG was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

140.    Based on the foregoing, the market for BMW AG's ADRs promptly digested current information regarding BMW from all publicly available sources and reflected such information in the prices of the ADRs, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

141.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

142.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

143.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

144.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BMW AG's ADRs during the Class Period.

146. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of BMW AG were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of BMW, their control over, and/or receipt and/or modification of BMW AG's allegedly materially misleading statements, and/or their associations with BMW which made them privy to confidential proprietary information concerning BMW, participated in the fraudulent scheme alleged herein.

147. Individual Defendants, who are the senior officers and/or directors of BMW, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other BMW personnel to members of the investing public, including Plaintiffs and the Class.

148. As a result of the foregoing, the market price of BMW AG's ADRs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of BMW AG's ADRs during the Class Period in purchasing BMW AG's ADRs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

149. Had Plaintiffs and the other members of the Class been aware that the market price of BMW AG's ADRs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the ADRs at the artificially inflated prices that they did, or at all.

150. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

151.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of BMW AG's ADRs during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

152.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    During the Class Period, the Individual Defendants participated in the operation and management of BMW, and conducted and participated, directly and indirectly, in the conduct of BMW's business affairs. Because of their senior positions, they knew the adverse non-public information about BMW's retail sales volume and its internal controls.

154.    As officers and/or directors of a publicly-traded company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BMW's results of operations, and to correct promptly any public statements issued by BMW which had become materially false or misleading.

155.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BMW AG disseminated in the

marketplace during the Class Period concerning BMW's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BMW to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of BMW within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BMW AG's ADRs

156.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BMW.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' Counsel as Class Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and

further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 24, 2021                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Yu Shi, Esq. (*Pro Hac Vice*)
275 Madison Ave, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of September 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/* Laurence M. Rosen