# Exhibit A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 10850 / September 24, 2020

**ADMINISTRATIVE PROCEEDING**
File No. 3-20060

| | |
|---|---|
| **In the Matter of**<br><br>BAYERISCHE<br>MOTOREN WERKE<br>AKTIENGESELLSCHAFT,<br>BMW OF NORTH<br>AMERICA, LLC, AND<br>BMW US CAPITAL, LLC,<br><br>**Respondents.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), against Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), BMW of North America, LLC ("BMW NA"), and BMW US Capital, LLC ("BMW USC") (collectively, "BMW" or "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

**<u>Introduction</u>**

1.      This matter arises out of inaccurate disclosures by BMW, an automotive company, of its retail vehicle sales volume in the United States.  In order to close the gap between actual retail sales volume and internal retail sales targets, and in an effort to publicly maintain a leading position relative to other premium automotive companies, BMW's domestic subsidiary, BMW NA, engaged in an effort to increase the number of publicly-reported retail vehicle sales in the U.S., one of the company's largest markets.  BMW NA engaged in this conduct toward the end of a given month, often on the last day, when it became apparent that BMW NA would be unable to meet its internal retail sales volume target through additional sales to dealerships' customers.  Faced with these shortfalls, BMW NA used end-of-month practices that improperly increased reported retail sales and created a misleading impression of BMW's sales performance in the U.S. market, despite internal concerns about these practices.[2]

2.      BMW NA used three practices that had the effect of inaccurately reporting its U.S. retail vehicle sales volume (a non-financial metric).  First, from January 2015 through March 2017, BMW NA used its demonstrator and service loaner programs to boost reported retail sales volume and meet internal targets, resulting in demonstrator and loaner vehicles accounting for over one quarter of BMW NA's reported retail sales in this period.  BMW NA offered independently-owned BMW auto dealers financial incentives to designate (or "punch"[3]) vehicles as demonstrators (*i.e.*, vehicles used for test drives, showroom displays, or other marketing purposes) or service loaners, so that those vehicles would be counted by BMW as retail sales, even though the dealers had not sold the vehicles to customers.  This was done without regard to whether dealers had a legitimate business need for additional demonstrators and service loaners, or whether the dealers put those vehicles to use as demonstrators or service loaners.  Second, from 2015 through 2019, BMW NA maintained an excess reserve of unreported retail vehicle sales that it used when necessary to meet internal targets in a given month, without proper regard to when the underlying retail sales actually occurred.  BMW NA referred to these unreported retail sales as the "bank," and managed the bank to keep a supply of unreported retail sales available when needed to meet internal retail sales targets.  Finally, in January 2015 and January 2017, BMW NA improperly adjusted its retail sales

---

[1]      The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]      This matter concerns BMW's disclosure of retail sales transactions (*i.e.*, number of vehicles reported as sold by independent dealerships), as opposed to wholesale transactions.  BMW NA imports and distributes vehicles to its dealer network through wholesale transactions, and BMW AG publicly reports wholesale revenue in its financial statements.

[3]      Although "punching" historically referred to the process of an automotive dealer reporting to the manufacturer or distributor that a vehicle had been sold to a customer, the term came to be used to refer to the practice of designating vehicles as demonstrators and loaners at the end of the month so that BMW could include those vehicles in its reported retail sales numbers.

reporting calendar, which usually followed a standard calendar used in the automotive industry, to achieve internal retail sales targets or bank excess retail sales for use in future reporting periods.

3.      BMW AG, a German corporation and the ultimate parent company of BMW NA and BMW USC, raised approximately $18 billion through seven bond offerings on the U.S. capital markets from 2016 through 2019, which were offered and sold to investors pursuant to Rule 144A promulgated under the Securities Act.  In connection with these bond offerings, BMW AG, through BMW USC, provided information about BMW's U.S. retail vehicle sales to bond investors, initial purchasers, and credit rating agencies in offering memoranda and investor presentations.  BMW NA also issued monthly press releases during this period regarding BMW's U.S. retail sales.  These disclosures of retail sales were inaccurate and misleading because they improperly included vehicles that had been designated at month-end as demonstrators and loaners solely for purposes of artificially increasing reported sales, regardless of whether additional demonstrators and loaners were needed by dealers or were used as such, and failed to disclose the magnitude of BMW NA's improper use of demonstrators and loaners, the extent to which these practices contributed to reported U.S. retail sales, and the use of the bank and retail sales reporting calendar modifications.[4]  BMW, therefore, provided materially incomplete and inaccurate information regarding its U.S. retail sales performance and customer demand for BMW vehicles in the U.S. market.

4.      As a result of such conduct, BMW violated Section 17(a)(2) and 17(a)(3) of the Securities Act.

## **Respondents**

5.      **Bayerische Motoren Werke Aktiengesellschaft ("BMW AG")** is a manufacturer of passenger cars, light trucks, and motorcycles, which it sells under the BMW, MINI, and Rolls-Royce brands.  BMW AG is a German corporation with its headquarters and principal place of business in Munich, Germany.  BMW AG was the guarantor of bonds issued by BMW USC in seven offerings from 2016 through 2019.  These bond offerings were sold to U.S. investors in Securities Act Rule 144A offerings (the "144A Bond Offerings").

6.      **BMW of North America, LLC ("BMW NA")** is a Delaware limited liability company with its principal place of business in New Jersey, and is an indirectly-owned subsidiary of BMW AG.  BMW NA is the national sales company of BMW AG in the U.S. and imports and distributes BMW vehicles to independently-owned BMW dealerships.  Since at least 2015, the U.S. has been BMW's second-largest national market, accounting for approximately 15% of vehicles sold by BMW AG worldwide.  BMW NA was responsible for reporting U.S. sales to the public and to BMW AG.

---

[4]      When a dealership sold a vehicle to a customer, or designated a vehicle as a demonstrator or service loaner, it reported that information to BMW NA, which provided the resulting retail sales data to BMW AG.  When a vehicle that was previously designated as a demonstrator or service loaner was later sold to a customer, that second transaction was not reported as a retail sale.

7.      **BMW US Capital, LLC ("BMW USC")** is a Delaware limited liability company with its principal place of business in New Jersey, and is an indirectly-owned subsidiary of BMW AG.  BMW USC is responsible for providing funding and liquidity for BMW in the U.S. and elsewhere.  BMW USC issued the bonds in the 144A Bond Offerings.

## Facts

**A.      The Demonstrator and Loaner Programs Were Used to Increase BMW NA's Reported Retail Sales.**

8.      From January 2015 through March 2017, BMW NA offered financial incentives to dealers to report vehicles as demonstrators or service loaners.  Because BMW NA included vehicles designated as demonstrators and service loaners as part of its reported retail sales, these incentive programs allowed BMW NA to increase its reported retail sales.  BMW NA referred to these incentives as "month-end actions," and used these programs to "close the gap" between its expected retail sales and its internal retail sales targets on a monthly basis.  Demonstrators and loaners accounted for 27% of BMW NA's reported retail sales for the period from January 2015 through March 2017.  In certain months during this period, demonstrators and loaners accounted for approximately 40% or more of BMW NA's reported retail sales.  These purported demonstrator and loaner vehicles were not actually sold to customers at the time that they were reported as retail sales by BMW NA.

9.      In most months during this period, BMW NA management authorized a set of incentives at the end of the month to "close the gap" between actual retail sales and BMW NA's internal monthly target, which had been agreed upon by BMW NA and BMW AG as part of the annual planning process.  By the end of the month, when it became apparent that BMW dealers would not be able to sell sufficient vehicles to retail customers to achieve BMW NA's internal retail sales targets, BMW NA offered dealers financial incentives, often contacting dealers multiple times or after business hours at the very end of the month, to encourage dealers to designate vehicles as demonstrators and loaners in order to help BMW NA achieve its monthly internal retail sales targets.  BMW paid dealers financial incentives, typically between $1,000 and $3,000, for each vehicle designated as a demonstrator or loaner as part of the month-end programs.

10.      In 2015, BMW NA made heavy use of a designation known as the "Specialty 8" demonstrator, which was used almost exclusively at month-end.  Half of Specialty 8 demonstrators were not sold to customers until more than sixty days after they were originally designated as demonstrators.  BMW NA stopped using the Specialty 8 program in early 2016, but nonetheless continued offering incentives to dealers to designate vehicles as "sales demonstrators" or loaners on the last day of the month.

11.      During the period from January 2015 through March 2017, U.S. dealers reported over 80% of their demonstrator and loaner designations on the last day of the reporting month, compared to just 13% of sales to individual consumers.  The demonstrator and loaner designations accounted for most of the retail sales recorded by BMW NA on the last day of the month.

12.     BMW NA's use of the demonstrator programs resulted in a significant buildup of dealer inventory of demonstrator vehicles.  These growing inventory levels made it more difficult for BMW NA to achieve its internal monthly retail sales targets using sales to customers, as dealers prioritized sales of their existing demonstrator inventory over sales of new inventory.  In June 2015, a BMW NA executive wrote that the use of "month end actions is not sustainable" because "[t]he inventory buildup is problematic."  The next month, that executive reiterated, "Our ability to bridge the gap with a month end action is significantly compromised given current demo levels."  An analysis prepared by BMW NA in November 2015 stated that "Retail aspiration in the 2nd half of 2015 could only be met by increasing Demonstrator volume," but that dealer sales to consumers of vehicles previously designated as demonstrators "lower the potential to report new retails[,] causing additional demonstrator programs and perpetuating the issue."  One internal analysis asked about Specialty 8 demonstrators, "Kicking the can down the road?"

13.     BMW NA paid dealers to report vehicles as demonstrators and loaners without regard to whether a particular dealer had a business need for additional demonstrators and loaners. Although BMW NA required dealers to have a minimum number of demonstrators available for customer test-drives, showroom displays, or other marketing purposes, the number of demonstrators included in BMW NA's reported sales exceeded the number of demonstrators required by its dealership agreements.  Specialty 8 demonstrators were often not used for customer test drives; over half of Specialty 8 demonstrators were sold with less than fifty miles.  Similarly, dealers designated more vehicles as loaners than were needed to satisfy the needs of customers whose vehicles were being serviced.  When designing the month-end incentive programs, BMW NA did not take into account the number of vehicles that dealers required for use as demonstrators or loaners.

14.     Dealers communicated to BMW NA their concerns regarding the use of month-end incentives for demonstrators and loaners, describing the programs as "late-inning monthly close shenanigans" and "panic punch programs" and expressing concern about "false reporting." Dealers also informed BMW NA that it had set "unrealistic volume goals" that could not be "achieved through retail sales to BMW buyers."

**B.     BMW NA Used Month-End Demonstrator and Loaner Designations to Meet Retail Sales Targets and Other Goals.**

15.     BMW NA had difficulty meeting its internal retail sales targets during this period. BMW NA management understood that these targets were difficult to achieve, and discussed with BMW AG management that the U.S. retail sales targets could only be achieved if retail sales included a significant number of demonstrator and loaner vehicles.

16.     BMW NA used the month-end incentive programs to close the gap to retail sales targets.  In February 2015, for example, a BMW NA executive wrote an email that "outlined . . . the actions to close the February gap," specifically that BMW NA would pay dealers an incentive for certain vehicles "retailed as a Specialty [8] Demo" on the last reporting day of the month, at an estimated cost that month of $7.8 million.  In the last days of April 2015, BMW NA executives determined that they were "currently experiencing a gap of approximately 6,000 units," and

decided to pay dealers both loaner incentives and Specialty 8 demonstrator incentives to try to close that gap.

17.     At the end of November 2015, BMW NA management issued instructions "to find ways to get above 32.000 retails." In response, the sales department proposed using the loaner and Specialty 8 demonstrator programs to achieve that target. BMW NA reported 32,003 retail sales of BMW brand vehicles for that month, 36% of which consisted of demonstrators, loaners, and banked vehicles. Toward the end of January 2016, BMW NA management responded to a forecast of approximately 14,500 sales by directing that "18,000 is the bare minimum to be reported for January." BMW NA ultimately reported 18,082 retail sales of BMW brand vehicles in January 2016, just above the target set by management.

18.     In some instances, these month-end incentive programs had an impact on year-over-year retail sales volume comparisons. An internal analysis in July 2015, for example, found that, even though BMW NA had publicly reported 7% year-over-year growth in retail sales volume between the first half of 2014 and the first half of 2015, it had in fact experienced a "[g]rowth rate of 0% vs. 2014" in consumer retails. The reported sales growth was a product of an increase in the designation by dealers of vehicles as demonstrators and service loaners compared to the prior year. At the end of December 2015, BMW NA executives noted that, without the use of the Specialty 8 demonstrator program, "we would end up" with "no growth in 2015" retail sales, when compared to BMW NA's 2014 retail sales. A December 2016 analysis stated that the use of demonstrators and loaners "has played a bigger contribution in sales performance since 2013, while consumer retails have declined."

19.     During this period, BMW NA also used the month-end programs to publicly maintain a leading position relative to other premium automotive companies. In evaluating possible month-end actions to achieve internal retail sales targets for December 2015, BMW NA management reviewed that year's "month and year end figures of [competitors]," because they "[w]ould hate to miss any chance of still staying ahead by a few hundred or thousand units" and wished to use this information as "[o]ne more input in deciding how much to spec 8." BMW NA had just forecasted that it would end 2015 with approximately 345,000 retail sales (short of the previous internal target of 352,000), but after reviewing year-to-date retail sales for other premium brands, BMW NA management decided to "shoot for 346[,000] or so, probably behind [Competitor 1] but in line with [Competitor 2]." They issued instructions to "try to get as much in terms of loaners" as possible. BMW NA reported 346,023 retail sales for 2015, just above the last-minute internal target set by executives. Demonstrators and loaners accounted for 44% of BMW NA's reported retail sales in December 2015, and 30% of its reported retail sales for 2015 overall.

20.     Beginning in April 2017, following growing dealer complaints, and out of concern over rising dealer inventories, BMW NA discontinued the use of month-end incentives for demonstrators and loaners.

**C.     BMW NA Used a "Bank" of Unreported Retail Sales to Manage Reported Retail Sales.**

21.     In most months from 2015 through 2019, BMW NA used an excess reserve of previously unreported retail sales to further manage its reported retail sales volume.  In months that total retail sales reported by dealers exceeded BMW NA's internal retail sales targets, BMW NA selected what retail sales number to report publicly and "banked" (*i.e.*, held back) the remaining retail sales.  In months that total retail sales reported by dealers fell short of BMW NA's internal retail sales targets, BMW NA management used retail sales from that bank to help close the gap to its internal targets.  Adjustments using the bank often exceeded 10% of the total retail sales reported by dealers in a month, and in two months exceeded 20%.

22.     The use of the bank was part of BMW NA's ongoing planning.  In months when BMW NA expected retail sales to be slow because of seasonal variation, such as January and February, BMW NA built into its planning assumptions the use of banked retail sales.  In addition, when BMW NA anticipated difficulty achieving its internal retail sales targets for a month, it used banked retail sales as a cushion to effectively reduce the targets for that month.  For instance, in January 2015, BMW NA's management explained that they were following "the original plan . . . to use 1,200 units from the bank" to help achieve the target, and that "[a]ny shortfall to the January target will be taken from the planned March Bank."

23.     The use of the bank was planned and approved by BMW NA management.  For instance, in September 2016, BMW NA management discussed that the forecasted number of retail sales for that month "includes bank withdrawal of 2325."  BMW NA publicly reported 25,389 retail sales for September 2016, which included these 2,325 banked retail sales.  For October 2016, BMW NA reported retail sales of 24,017 BMW brand vehicles, after a BMW NA executive decided to "[p]ick a number slightly above 24k and bank the rest."

24.     BMW NA management also discussed the use of the bank with BMW AG personnel.  In at least one instance, BMW AG told BMW NA that it could bank retail sales from the prior year because BMW AG had already achieved its internal targets without those additional retail sales.

**D.     BMW NA Departed from Its Regular Retail Sales Reporting Calendar to Meet Internal Retail Sales Targets.**

25.     At the beginning of 2015 and 2017, BMW NA modified its retail sales reporting calendar to help manage reported retail sales.

26.     In January 2015, BMW NA failed to close the December 2014 retail sales reporting period in a timely fashion.  Under the industry-standard calendar typically followed by BMW NA, retail sales reported by dealers through January 2, 2015 would have been reported by BMW NA as retail sales made in December 2014.  However, BMW NA extended the reporting period through January 5, allowing an additional three days of retail sales reported by dealers in January 2015 to be counted by BMW NA as 2014 sales.  One BMW NA executive explained that "[t]his gives us a

little insurance," and that if this resulted in more retail sales being generated for December 2014 than necessary, "we will bank for January."

27.     In January 2017, BMW NA closed the December 2016 retail sales reporting period early. In light of questions raised by BMW's Internal Audit group, BMW NA had become concerned that it would not be permitted to continue the use of the bank in 2017. BMW NA therefore used the calendar modification as an alternative method of creating a bank, by closing the retail sales reporting period once internal targets were achieved.

**E.     BMW NA and BMW AG Failed to Adequately Implement Internal Audit Recommendations Regarding the Sales Reporting Practices.**

28.     BMW's Internal Audit group detected two of the retail sales reporting practices being used by BMW NA and recommended that the practices be discontinued, but BMW NA failed to implement these recommendations in a timely manner.

29.     In May 2015, Internal Audit determined that BMW NA was using demonstrators and loaners to accelerate reporting of retail vehicle sales. Internal Audit further determined that the Specialty 8 demonstrator program was used to "fine tune monthly retail figures" and that demonstrators typically remained with dealers at the time they were reported as retail sales. In response to Internal Audit's findings, BMW NA management responded that the use of Specialty 8 demonstrators was "the most efficient instrument to meet sales targets." Internal Audit recommended limiting what percentage of overall retail sales could consist of demonstrators and service loaners, and carefully monitoring the use of these categories. However, BMW NA and BMW AG failed to promptly implement changes to address Internal Audit's concerns. Six months later, in November 2015, Internal Audit determined that BMW NA and BMW AG had failed to take sufficient measures to avoid "unjustified retail reporting" and that dealer inventory of Specialty 8 demonstrators had actually increased.

30.     Starting in March 2015, Internal Audit also repeatedly identified and objected to BMW NA's use of the "bank." Internal Audit noted that BMW NA's use of the bank was tied to "meeting requested monthly or quarterly targets." Internal Audit cautioned that these "[r]etail sales reporting inaccuracies lead to an inappropriate assessment of sales performance and may result in unsustainable marketing and sales business practices," and recommended that BMW NA cease using the bank. Over the next few years, Internal Audit repeatedly warned about the use of the bank, but BMW NA did not discontinue the practice until 2020.

**F.     BMW NA's Retail Sales Reporting Practices Were Not Adequately Disclosed in Connection with the 144A Bond Offerings.**

31.     By no later than January 2015, BMW AG began pursuing a potential capital raise in the U.S., to be accomplished through sales of bonds to investors in Securities Act Rule 144A offerings.[5] This culminated in April 2016 with BMW USC offering $4 billion of bonds. BMW

---

[5]     Rule 144A is a safe harbor from registration available solely for certain resale transactions; however, market participants use it to facilitate capital-raising by issuers by means of a two-step process, in which the first

USC conducted six further Rule 144A bond offerings in the U.S. from 2016 through 2019, raising approximately $14 billion in additional capital.  These bonds were guaranteed by BMW AG.

32.     In conjunction with each of the 144A Bond Offerings, BMW AG and BMW USC provided an offering memorandum to prospective investors.  These memoranda reported BMW AG's retail sales volume as a "non-financial key performance figure[]," and reported sales volume both on a global basis and specifically for the U.S. market, based on information provided by BMW NA.  In their presentations to investors in the bond offerings, BMW AG and BMW USC emphasized BMW's retail sales history and outlook.  In addition, BMW NA issued monthly press releases during the offering period disclosing inaccurate retail sales from the prior month, using data prepared by BMW NA's sales department.  The offering memoranda stated that "Retail vehicle sales data, which represent estimated sales to customers, including fleets, do not correlate directly to the revenue BMW [AG] recognizes during a given period, and, for example, includes in various jurisdictions, vehicles delivered for dealer use or demonstration and service loaners."  However, this disclosure did not reflect BMW NA's reliance on these practices to increase retail sales volumes, the magnitude of the improper use of demonstrators and loaners, or the use of the bank and retail sales reporting calendar modifications.  The retail sales reported in these disclosures were inaccurate because they included vehicles that had been designated at month-end as demonstrators and loaners solely for purposes of increasing reported sales, regardless of whether additional demonstrators and loaners were needed by dealers or were used as such.

33.     As a consequence, the information that BMW AG, BMW USC, and BMW NA provided to investors and initial purchasers in the 144A Bond Offerings and to credit rating agencies contained material misstatements and omissions regarding BMW's U.S. retail vehicle sales.

## G.     Cooperation and Remediation

34.     In determining to accept the Offers, the Commission considered the cooperation provided by Respondents to the Commission's Staff, as well as remedial measures undertaken by Respondents and their report of certain information to the Staff.

35.     BMW provided substantial cooperation during the investigation, notwithstanding the challenges presented by the global COVID-19 pandemic, which affected the company's operations and business in Germany and the U.S.  Despite the considerable constraints on BMW's ability to gather information under these circumstances, including travel restrictions, work-from-home orders, and office closures, BMW gathered and made available a large volume of information in response to document, information, and data requests.  Among other things, BMW promptly collected and produced a significant volume of electronic documents, including documents that would otherwise have been difficult and time-consuming for the Staff to obtain;

---

step is a primary offering on an exempt basis, often in reliance on Section 4(a)(2) of the Securities Act, to one or more financial intermediaries, and the second step is a resale to qualified institutional buyers pursuant to Rule 144A. An offering memorandum is typically drafted for use in marketing the securities sold in a Rule 144A offering to prospective investors.

documents from sources outside of BMW's corporate offices, such as BMW employees working from remote locations; and translations of key documents. BMW also made multiple current and former employees available for interviews by the Staff, and provided presentations and narrative submissions that highlighted critical facts. BMW provided this cooperation on the schedule requested by the Staff. The cooperation afforded by BMW substantially advanced the quality and efficiency of the Staff's investigation and conserved Commission resources.

36.     After the start of the investigation, BMW reported to the Staff that BMW NA had used the bank and modified the retail sales reporting calendar as described above. BMW also voluntarily took certain remedial measures during the investigation. BMW ended the use of the bank in 2020 and publicly issued revised U.S. retail sales figures that corrected for the use of the bank and modifications of the retail sales reporting calendar. BMW also enhanced its public disclosures regarding the inclusion of demonstrators and loaners in its publicly-reported retail sales figures.

37.     In consideration of BMW's extensive cooperation, the Commission has determined to impose a reduced penalty.

## Violations

Section 17(a)(2) proscribes obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Section 17(a)(3) proscribes engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." A violation of these provisions does not require scienter and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980). As a result of the conduct described above, BMW violated Section 17(a)(2) and 17(a)(3) of the Securities Act.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act, Respondents cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and 17(a)(3) of the Securities Act.

B.     Respondents shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $18 million, on a joint and several basis, to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether

10

the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Payment must be made in one of the following ways:

(1)    Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying BMW AG, BMW NA, and BMW USC as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Anita B. Bandy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-6561A.

C.    Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

11

D.      Respondents acknowledge that the Commission is not imposing a civil penalty in excess of $18 million based upon their cooperation in a Commission investigation.  If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondents knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondents, petition the Commission to reopen this matter and seek an order directing that the Respondents pay an additional civil penalty.  Respondents may contest by way of defense in any resulting administrative proceeding whether they knowingly provided materially false or misleading information, but may not:  (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.


By the Commission.



                                        Vanessa A. Countryman
                                        Secretary